**O**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WONDERLAND NURSERYGOODS CO., LTD., | Case No. 5:14-cv-01153-JWH-SP |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF No. 310], DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF Nos. 307 & 326], and DEFENDANT'S _DAUBERT_ MOTION [ECF No. 367]** |
| v. | |
| BABY TREND, INC., DENNY TSAI, and BETTY TSAI, | |
| Defendants. | |

# I. SUMMARY OF DECISION

Presently before the Court in this patent infringement case are three motions:

- Plaintiff Wonderland NurseryGoods Co., Ltd. moves for summary judgment of infringement against Defendant Baby Trend, Inc. with respect to Baby Trend's Category 1 products;[1]
- Baby Trend moves for summary judgment of non-infringement, invalidity, and intervening rights;[2] and
- Baby Trend moves to exclude and strike certain rebuttal opinions by Bryan Van Uden, Wonderland's damages expert.[3]

After considering the papers filed in support and in opposition, as wells as the arguments presented at the hearing,[4] for the reasons stated below, the Court will:

- **GRANT** Wonderland's motion for partial summary judgment;
- **GRANT** Baby Trend's motion for summary judgment with respect to intervening rights for Category 1 products; **GRANT** Baby Trend's motion with respect to non-infringement of Category 2 and Categories 3-6 products; and **GRANT** Baby Trend's motion with respect to invalidity based upon the original patent requirement; and

---

[1]     Pl. Wonderland NurseryGoods Co., Ltd. Mot. for Part. Summ. J. (the "Wonderland PMSJ") [ECF No. 310].

[2]     Def. Baby Trend Inc.'s Mot. for Summ. J. (the "Baby Trend MSJ") [ECF Nos. 307 & 326 (sealed)].

[3]     Mot. under *Daubert* to Exclude and Strike Certain Opinions Offered by Mr. Bryan Van Uden in Rebuttal (the "Van Uden Rebuttal Motion") [ECF Nos. 350 & 367 (sealed)].

[4]     To resolve these motions, in addition to the Court's prior orders in this case, the Court considered the following papers and all of their respective attachments, including the sealed versions:  (1) Compl. [ECF No. 1]; (2) Am. Answer [ECF No. 118]; (3) Wonderland PMSJ; (4) Corrected Memo in Supp. of the Wonderland PMSJ [ECF No. 314]; (5) Opp'n to the Wonderland PMSJ (the "PMSJ Opposition") [ECF No. 327]; (6) Reply in Supp. of the Wonderland PMSJ (the "PMSJ Reply") [ECF No. 336]; (7) Baby Trend MSJ; (8) Opp'n to the Baby Trend MSJ (the "MSJ Opposition") [ECF No. 334]; (9) Reply in Supp. of the Baby Trend MSJ (the "MSJ Reply") [ECF No. 336]; and (10) Wonderland's Joint Statement of Undisputed Facts (the "JSUF") [ECF No. 330].

- **DENY as moot** Baby Trend's *Daubert* motion regarding Van Uden's rebuttal opinions.

Based upon these rulings, the Court need not reach the issue of intervening rights on Category 2 products.

For ease of reference, the Court provides the following summary table of its rulings:

| Product Category No. | Asserted Claims | Rulings |
|---|---|---|
| Category 1 | Claims 1, 2, & 4-29 | Wonderland's motion for summary judgment of infringement is **GRANTED** (*see* § III.A.); Baby Trend's motion for summary judgment regarding intervening rights for Category 1 is **GRANTED** (*see* § III.B.3.) |
| Category 2 | Claims 8-11, 14-16, 19, & 29 | Baby Trend's motion for summary judgment regarding non-infringement of Claims 8 and 15 and their respective dependent claims is **GRANTED** (based upon the absence of "positioning posts") (*see* § III.B.1.b.i.) |
| Category 3 | Claims 20 & 27 | Baby Trend's motion for summary judgment regarding non-infringement is **GRANTED** (based upon the presence of rivets) (*see* § III.B.1.b.ii.) |
| Category 4 | Claims 20, 27, & 28 | same as Category 3 |
| Category 5 | Claims 20, 27, & 28 | same as Category 3 |
| Category 6 | Claims 20 & 27 | same as Category 3 |

| Other Rulings |
|---|
| Baby Trend's motion for summary judgment of invalidity based upon the original patent requirement is **GRANTED** (*see* § III.B.2.) |

## II.  BACKGROUND

Wonderland is the assignee of the patent at issue in this case:  U.S. Reissue Patent No. 43,919, entitled "Baby Crib."[5]  Wonderland accuses Baby Trend's activities of infringing the '919 Patent.[6]

The '919 Patent discloses "a baby crib that can be easily assembled" with "a fabric member effectively positioned on a bed frame structure" to give the crib "an appealing appearance."[7]  The claimed baby crib sought to improve upon prior art cribs, the assembly of which "consume[d] a lot of time" and the "outer appearance" of which was unattractive because of visible screws attaching the enclosure to the frame.[8]  Additionally, the enclosure was more likely to tear where each screw penetrated the enclosure.[9]  The baby crib disclosed in the '919 Patent touts easy assembly, which in its preferred embodiment involves mounting positioning posts on the enclosure and placing those posts into upright tubes on the bed frame, without the need for exterior screws.

## III.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party.  *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

---

[5]  *See* U.S. Reissue Patent No. RE43,919 (the "'919 Patent") [ECF No. 1-1].

[6]  The remaining defendants—Betty Tsai and Denny Tsai—have been dismissed.  *See* Stip. of Voluntary Dismissal [ECF No. 322].

[7]  '919 Patent 1:43-46.

[8]  *Id.* at 1:31-40.

[9]  *Id.*

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). The substantive law determines the facts that are material. *See id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* Factual disputes that are "irrelevant or unnecessary" are not counted. *Id.* A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Under this standard, the moving party bears the initial burden of informing the district court of the basis for its motion and identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *See id.* at 325. Instead, the moving party need only prove there is an absence of evidence to support the non-moving party's case. *See id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *See Celotex*, 477 U.S. at 324. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *Oracle*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252). The non-moving party must make this showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252.

## IV.  DISCUSSION

### A.    Wonderland's Motion for Partial Summary Judgment of Infringement

Wonderland seeks partial summary judgment of infringement by Baby Trend's Category 1 products because, Wonderland argues, "[t]here is no genuine dispute that the Category 1 products satisfy each and every limitation of

claim 1." Wonderland contends that those "products are a direct knock-off of the preferred embodiment illustrated in Figures 3 and 5 of the '919 Patent."[10] In support of that contention, Wonderland provides the following comparison:[11]

| '919 Patent, Fig. 5 | Wisteria Lane Upright Tube |
|---|---|
|  |  |

In further support of its infringement argument, Wonderland provides an element-by-element comparison of the accused products with the claim limitations.[12] Wonderland observes that Baby Trend has not identified any missing claim elements in the accused products.[13]

Baby Trend opposes Wonderland's motion by maintaining that absolute intervening rights preclude any infringement liability for its Category 1 products.[14]

---

[10]   Wonderland PMSJ 1:7-11.

[11]   *See id.* at 3:2-20 & 4:11-25.

[12]   *See id.* at 6:10-9:22.

[13]   *Id.* at 9:23-10:14.

[14]   PMSJ Opposition 1:8-9.

Baby Trend argues that "absolute intervening rights is a defense against patent infringement—not merely a limitation on damages."[15]

### 1.   Legal Framework

Determining infringement of a utility patent is a two-step process. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). "First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Id.* (citations omitted). "Whether an accused device or method infringes a claim either literally or under the doctrine of equivalents is a question of fact." *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001).

A defendant accused of infringing a reissue patent enjoys the additional defense commonly known as "intervening rights." Specifically, "[a] ***reissued*** patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, ***to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold***, ***the specific thing*** so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent." 35 U.S.C. § 252 (emphasis added).

### 2.   Analysis

If the Court finds that intervening rights shield Baby Trend from infringement liability (an issue discussed below in the context of Baby Trend's motion for summary judgment), then the parties dispute whether the Court should (1) find infringement as a matter of law but rule that no damages are available (Wonderland's preference); or (2) decline to find infringement as a matter of law because intervening rights preclude such a finding (Baby Trend's preference).

Based upon the plain language of the relevant statutes, the Court concludes that infringement must first be determined, and, then, if intervening rights apply, there can be no damages for otherwise-infringing products. If there is no

---

[15]    *Id.* at 1:10-11.

infringement, then there is no occasion to consider whether intervening rights apply.

First, the express terms of the primary patent infringement statute provide that "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, *infringes the patent*." 35 U.S.C. § 271 (emphasis added). The statute pertaining to reissue patents does not create an exemption to infringement nor negate the fact that otherwise-infringing products infringe; rather, it protects "*the right*" of a person importing or selling a product that was not protected by a patent when the person started importing/selling, but in the intervening period since those sales/imports began, a reissue patent has been granted that now covers that "specific thing" being imported/sold. 35 U.S.C. § 252 (emphasis added). When read together, the Court finds nothing in § 252 that renders infringing conduct non-infringing. Instead, § 252 provides a safe harbor—*i.e.*, intervening rights—in which the infringer cannot be held liable for its infringement.

This reading is supported by caselaw. Both the Supreme Court and the Federal Circuit have treated absolute intervening rights—which shield products that infringe enlarged reissue claims—as a doctrine that applies post-infringement to prevent the patent holder from collecting damages. For example, in *BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1222 (Fed. Cir. 1993), the Federal Circuit "discern[ed] no error in the trial court's determination that the[] [accused] sailboards were purchased within the meaning of section 252 before the critical [reissue] date of March 8, 1983." The court explained, "[b]ecause BIC purchased the boards before the reissue date, the district court properly *excluded* the post-reissue sale of the 10,870 sailboards *from the computation of damages*." *Id.* (emphasis added). The court did not find non-infringement.

Similarly, upon assuming that *a reissue patent was infringed*, the Supreme Court "consider[ed] the effect of the enlarged [reissued] claims upon [the accused infringer's] machine, lawfully manufactured and operated prior to the[] inception" of the enlarged claims, and found that the accused infringer "acquired at least a right to continue to use these two [accused] machines as if it *held a license* therefor under the reissued patent." *Sontag Chain Stores Co. Ltd. v. Nat'l Nut Co. of California*, 310 U.S. 281, 285, 295-96 (1940) (emphasis added). Again, the Court did not reject the infringement finding based upon intervening rights, but, instead,

the Court concluded that there could be no liability for the affected products, just as if the infringer held a license to use the reissued patent.

Accordingly, this Court rejects Baby Trend's contention that intervening rights can otherwise shield it from a finding of infringement. Because Baby Trend does not challenge Wonderland's assertion that the Category 1 products contain every element of asserted Claim 1, there is no disputed issue of material fact concerning infringement. Thus, the Court **GRANTS** Wonderland's Motion.

However, because below the Court also grants Baby Trend's Motion concerning intervening rights, taken together, those rulings preclude Wonderland from collecting damages on Category 1.

## B.     Baby Trend's MSJ

### 1.     Literal Infringement

Baby Trend moves for summary judgment that it does not literally infringe Claims 8-11, 14-16, 19-20, and 27-29 of the '919 Patent, all with respect to its Category 2-6 Products.[16]

#### a.     Legal Framework

The Court previously recited the two-step process for determining patent infringement. *See Cybor Corp.*, 138 F.3d at 1454. Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). If the moving party meets this initial requirement, then the burden shifts to the party asserting infringement to set forth, by declaration or as otherwise permitted under Rule 56 of the Federal Rules of Civil Procedure, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

---

[16]     Baby Trend MSJ 1:4-6; *see also id.* at 1 n.1 (noting that Wonderland withdrew its infringement allegations regarding Claims 1 and 3-5 with respect to the Category 2 products); *see also id.* at 4:1-8 (chart summarizing asserted claims against representative products by category).

b.    **Analysis**

i.    **Claims 8 and 15 and Their Dependent Claims**

Baby Trend argues that it does not infringe the two independent claims of the '919 Patent because they require "a plurality of positioning posts"—which the Court construed as "separate components from the fabric/enclosure member"—and the accused Category 2 products do not have such separate positioning posts.[17] Baby Trend rejects Wonderland's infringement expert's opinion that a "rolled piece of binding" or fabric webbing sewn to the fabric member can the claimed positioning post.[18] Further, Baby Trend argues that the accused positioning post is made out of fabric (instead of plastic, wood, or metal as described in the specification), and, therefore, it cannot bear compressive and bending loads for easy assembly.[19]

Wonderland responds that the Court's claim construction for "positioning post" said nothing about "separability," and Baby Trend's own expert's demonstration shows that the fabric member is a separate component from the accused fabric webbing that satisfies the "positioning post" limitation.[20] Further, Wonderland notes that the Court's claim construction placed no limits on the type of material or physical properties of the positioning posts.[21] Wonderland argues that, taking the evidence in the light most favorable to Wonderland, its expert's testimony that "the rolled fabric webbing attached to the fabric enclosure and placed into the upright tubes of the accused Category 2 Products satisfies the 'positioning post' limitations" at least creates a disputed issue of material fact.[22]

In reply, Baby Trend argues that no reasonable juror could find the rolled fabric webbing to be the claimed positioning post and that Wonderland's expert provides no explanation to support his opinion to the contrary.[23]

---

[17]    Baby Trend MSJ 5:13-20; *see also* Claim Construction Order [ECF No. 170] 23.

[18]    Baby Trend MSJ 6:2-6.

[19]    *Id.* at 6:16-28.

[20]    MSJ Opposition 3:12-22.

[21]    *Id.* at 3:23-27.

[22]    *Id.* at 4:11-16.

[23]    MSJ Reply 1:24-26.

In the Claim Construction Order, the Court ruled that "plain meaning applies" to "positioning posts," and, thus, "no further construction is needed." But "for the sake of clarity, the Court confirm[ed] that the [positioning post] limitations make clear that the positioning posts are separate components from the fabric/enclosure member."[24]  For example, Claim 1 recites positioning posts "mounted on" the fabric member.[25]

*First*, construing the evidence in the light most favorable to Wonderland, the Court concludes that competing expert testimony regarding whether the rolled fabric webbing is ***separate*** from the fabric member precludes a finding of non-infringement on this particular point.  The parties agree that the rolled fabric webbing is sewn to the fabric member, necessarily implying that it began as a separate component.  Neither party points to anything in the '919 Patent suggesting that separate components cannot later be joined, especially where the positioning posts are described as being "mounted on" the fabric member.[26]

*Second*, construing the evidence in the light most favorable to Wonderland, the Court finds no disputed issue of material fact concerning non-infringement with respect to "positioning posts."  No reasonable juror could conclude that a "rolled piece of binding" or "fabric webbing" meets the positioning post limitations.[27]  Although the specification teaches that the positioning posts can be "formed as a flexible tube, such as a plastic or metal tube," even considering this flexibility, a rolled piece of fabric binding does not fall within the plain and ordinary meaning of a "positioning post."[28]

Wonderland's expert attempts to controvert this fact by opining that the positioning posts in the accused products "are comprised of a rolled piece of binding (*i.e.*, a separate component of the fabric member)," but he provides no

---

[24]    Claim Construction Order 23:8-12.

[25]    *Id.* at 23:13-15.

[26]    *See, e.g.*, '919 Patent at Abstract.

[27]    *See* JSUF ¶ 45 (Wonderland's expert's opinion attempting to controvert this point).

[28]    '919 Patent 2:39-43; *see also id.* at 2:60-62 ("[s]ince the positioning posts **22** are flexible, they can follow the curved configuration of the upright tubes **11** upon insertion into the receiving holes **111**" as shown in Fig. 4).

explanation that would support the conclusion that a person of ordinary skill would understand the claimed "positioning posts" to encompass rolled fabric binding.[29]



This conclusory opinion is insufficient to create a disputed issue of material fact regarding the presence of positioning posts in the accused products. *See, e.g.*, *SIMO Holdings v. Hong Kong uCloudlink*, 983 F.3d 1367, 1381 (Fed. Cir. 2021) (at summary judgment, "a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement") (quotation marks omitted).

Accordingly, the Court **GRANTS** Baby Trend's motion with respect to non-infringement of Claims 8 and 15 by the Category 2 products.

### ii.    Claim 20 and Its Dependent Claims

Baby Trend argues that it does not infringe Claim 20 because each of the accused Category 2-6 Products includes rivets that pierce the fabric member, which "defeats a primary purpose of the '919 Patent:  easy assembly and disassembly."[30]

---

[29]    Joint Exhibit, Part B, Expert Report of Peter J. Myers (the "<u>Myers Report</u>"), Ex. F [ECF No. 307-3] 567.

[30]    Baby Trend MSJ 7:4-8.

Specifically, "each of the Category 3-6 Products include[s] rivets at each corner of
the playard that result in a permanent connection of the fabric member that cannot
be disassembled."[31]  Further, Baby Trend maintains that those products do not
infringe for the additional reasons that they do not perform the identical function to
the Figure 5 structure (mounting and securing the edge portions of the enclosure
member along the support tubes without the need for screws), in substantially the
same way, with substantially the same resulting structure.[32]

     Wonderland responds that use of rivets does not preclude a finding of
infringement because "merely identifying objects of an invention [such as easy
assembly] does not mean that every claim in the patent must be construed to
include all of those objects as limitations, regardless of the actual claim language."[33]
Wonderland argues that neither the claim language of Claim 20 nor the Court's
construction thereof says anything about easy assembly.[34]  Specifically,
Wonderland contends that, in construing Claim 20 in light of Figure 5, "the Court
made no findings regarding whether some uses of fasteners could qualify as a § 112,
¶ 6 equivalent."[35]  Rather than "disclaim[ing] all uses of rivets, screws, or other
types of fasteners," Wonderland asserts that "[i]f anything, the '919 Patent
disclaims only the prior art approach of stretching the fabric tightly over the outside
of the upright tubes and holding it in place with screws visible from the outside of
the playard, which created a risk of tearing and detracted from the appearance of
the playard."[36]  Wonderland argues that the competing expert opinions create a
genuine issue of material fact concerning whether the accused products'
attachment structure with rivets is a § 112, ¶ 6 equivalent of Claim 20.[37]

     In reply, Baby Trend argues that "easy assembly/disassembly and the
exclusion of external fasteners must, at the very least, be accounted for in the § 112,

---

[31]    *Id.* at 7:14-16.

[32]    *Id.* at 9:15-20 & 15:23-24; *compare id.* at 16:27-17:3 ("in the Category 3-6
Products, the fabric enclosure is wrapped around a metal rod/beam at each corner
of the playard," which is "riveted at a top and bottom end to the outside of the
corner tube, and the bottom rivets pierce the fabric enclosure").

[33]    MSJ Opposition 5:8-10.

[34]    *Id.* at 5:17-20.

[35]    *Id.* at 5:22-23.

[36]    *Id.* at 6:1-3, 7-10.

[37]    *Id.* at 6:13-27.

¶ 6 statutory equivalents analysis."[38]  "In view of the[] clear teachings of the '919 Patent," Baby Trend concludes that "there can be no reasonable dispute that a POSA[39] would consider these key facts in the § 112, ¶ 6 statutory equivalents analysis even if not expressly recited in the claims."[40]

Under the function-way-result test, "[l]iteral infringement of a means-plus-function claim limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006).  "Once the relevant structure in the accused device has been identified, a party may prove it is equivalent to the disclosed structure by showing that the two perform the identical function in substantially the same way, with substantially the same result." *Id.*

When considering the scope of "the functional statement in a means-plus-function limitation, [the Court] must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) (quotations omitted).  But, as with any claim, scope may be limited "if the intrinsic evidence shows that the patentee distinguished [a] term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366–67 (Fed. Cir. 2002).  Relatedly, "express disclaimer or independent lexicography in the written description" may "justify adding [a] negative limitation" to the claim scope.  *Omega Eng'g*, 334 F.3d at 1323.

In the Claim Construction Order, this Court ruled that § 112, ¶ 6 applies to "attachment structure configured to mount and secure the edge portions of the enclosure member along the support tubes" in Claim 20.[41]  Specifically, as shown in the specification, the "attachment structure" is achieved "by combining a sleeve portion **21** of the fabric member **2**, a positioning post **22**, an upright tube **11** with single slit **112**, a receiving hole **111**, a first wall part **114**, a second wall part **115**, and

---

[38]    MSJ Reply 3:8-9.

[39]    That is, a Person of Ordinary Skill in the Art.

[40]    *Id.* at 4:2-4 (footnote added).

[41]    Claim Construction Order 3:15-23; *see also id.* at 25:8-27:21.

a top open end 113."[42]  The function of the attachment structure is to "mount and secure the edge portions of the enclosure member along the support tubes."[43]



FIG. 5 (Amended)

The parties dispute whether the rivets permanently attaching the fabric enclosure to the upright tubes in the accused products can be a § 112, ¶ 6 equivalent under this construction.  In applying the function-way-result test, the Court considers the '919 Patent's teaching concerning screws—*e.g.*, if screws are impermissible, using screws or another type of external fastener such as a rivet at least cannot perform the same function in the same way.

The patent criticized prior art baby cribs that used screws to secure the fabric enclosure sleeves to the upright tubes because doing so created three problems: (1) assembly with screws was time consuming; (2) "a hole is formed in the enclosure **35** member **9** [by the screw] such that when the enclosure member **9** is stretched, the enclosure member **9** is likely to tear at the periphery of the hole";

---

[42]     *See id.*

[43]     *Id.*

and (3) "the outer appearance of the aforesaid baby crib is adversely affected since the screw **82** is visible from the exterior of the bed frame structure **8**."[44]

Wonderland's expert opines that having the "upright tube, positioning post attached to an interior facing wall of the upright tube with fasteners, and sleeve portion of the fabric/enclosure member" of the accused products is "an insubstantial change from the structure construed by the Court" because the structure in the accused products "simply moves the positioning post from the inside of the upright tube, and secures them with fasteners to an interior facing wall of the upright tube, which is an insubstantial difference."[45]  He opines that this change is insubstantial because "the positioning posts are still secured to an inside of the upright tube allowing the exterior surface of the upright tubes to be exposed without screws or fasteners visible from the outside of the tubes, and also allows for the frame structure and enclosure member to be assembled separately and then brought together."[46]



---

[44]    '919 Patent 1:31-40; *see also id.* at 1:43-46 (same objects of invention); *id.* at 2:3-5 (Figure 2 depicts a criticized prior art baby crib using screws); *id.* at 3:11-18 (citing no need for screws and benefits thereof); *id.* at 3:43-46 (same).

[45]    Myers Report, Ex. G 594-95.

[46]    *Id.*

Although Wonderland has provided some evidence to controvert whether that configuration addresses easy assembly and outward appearance—and therefore it may not be inconsistent with what is claimed—the rivets are permanently inserted through a hole in the fabric member.  Wonderland argues that its expert opined that the accused products do not "stretch[] the fabric over the outside of the tubes and pierc[e] it with a fastener in a manner that creates a risk of the fabric tearing,"[47] but the Court has reviewed the Myers Report, including the portions cited by Wonderland, and it provides no such opinion.[48]

Assuming, as Wonderland does, that the '919 Patent "disclaims only the prior art approach of stretching the fabric tightly over the outside of the upright tubes and holding it in place with screws visible from the outside of the playard, which created a risk of tearing and detracted from the appearance of the playard," Wonderland has presented no evidence that using rivets through the fabric would avoid the risk of tearing based upon placing the rivets on the inward-facing side of the upright tube's exterior.[49]  Thus, even assuming that rivets could constitute a § 112, ¶ 6 equivalent, Wonderland has provided no evidence to support the contention that the actual rivets used in the accused products meet the test to be an equivalent under Claim 20.

Specifically, Wonderland does not dispute that the '919 Patent criticizes and even disclaims the use of screws that risk tearing the fabric.  But Wonderland admits that the accused products use rivets through the fabric, and it provides no evidence to support the contention that that use does not risk tearing around the rivet holes as disclaimed in the patent.  In view of the patent's clarity regarding use of screws,[50] the Court finds that, by using rivets to pierce the fabric, the accused products fail to achieve the function of mounting and securing the edge portions of

---

[47]   MSJ Opposition 8:2-8.

[48]   *See, e.g.,* Myers Report, Ex. G 594-95 (without mentioning likelihood of tearing at piercing point, addressing only outer appearance and ease of assembly: the interior rivets are "an insubstantial change because in this configuration the positioning posts are still secured to an inside of the upright tube allowing the exterior surface of the upright tubes to be exposed without screws or fasteners visible from the outside of the tubes, and also allows for the frame structure and enclosure member to be assembled separately and then brought together").

[49]   MSJ Opposition 6:7-10.

[50]   *See, e.g., supra* n.44 (collecting citations in the '919 Patent criticizing use of screws); *see also* Order on Def. Mot. to Strike Pl. Infringement Contentions [ECF No. 301] 15:8-23 (explaining exclusion of external fasteners in Claim 20).

the fabric enclosure along the support tubes in the same way as set forth in
Claim 20.  This finding is consistent with the Court's Claim Construction Order; it
provides no new claim construction.  Accordingly, no reasonable jury would
conclude that the accused products qualify as an equivalent attachment structure
under the Court's construction.

Because the Court finds no disputed issue of material fact concerning that
aspect of Claim 20, the Court declines to reach the parties' alternative arguments.

Accordingly, the Court **GRANTS** Baby Trend's Motion for no infringement
of Claim 20 and its dependent Claims 27 and 28.

### 2.    Original Patent Requirement

Baby Trend moves for summary judgment that Claims 1-29 of the
'919 Patent are "invalid for violating the original patent requirement set forth in 35
U.S.C. § 251."[51]

### a.    Legal Framework

To obtain summary judgment of invalidity, a moving party must overcome
the statutory presumption that issued patent claims are valid.  *See* 35 U.S.C. § 282.
That statute mandates that "[a] patent shall be presumed valid" and that "[t]he
burden of establishing invalidity of a patent or any claim thereof shall rest on the
party asserting such invalidity."  *Id.*

One basis for potential invalidity arises under 35 U.S.C. § 251.  Under that
statute, if a "patentee claim[s] more or less than [s]he had a right to claim in [a]
patent," the patentee may ask the PTO to "reissue the patent for the invention
disclosed in the original patent, and in accordance with a new and amended
application, for the unexpired part of the term of the original patent."  35 U.S.C.
§ 251(a).  But "[n]o new matter shall be introduced into the application for
reissue."  *Id.*  Rather, the reissue patent must cover the "same invention."  *Id.*  To
satisfy the original patent requirement, "the original patent 'must clearly and
unequivocally disclose the newly claimed invention [in the reissued patent] as a
separate invention.'"  *Forum US, Inc. v. Flow Valve, LLC*, 926 F.3d 1346, 1352
(Fed. Cir. 2019) (quoting *Antares Pharma, Inc. v. Medac Pharma Inc.*, 771 F.3d 1354

---

[51]    Baby Trend MSJ 1:6-8.

(Fed. Cir. 2014)).  "Whether new claims in a reissue patent comply with 35 U.S.C.
§ 251 is a question of law[.]"  *Id.* at 1350-51.

"[A] reissue claim is for the 'same invention' if the original patent
specification fully describes the [now-]claimed inventions, but not if the broader
claims '[were] [ ] merely suggested or indicated in the original specification.'"
*Antares*, 771 F.3d at 1359 (quoting *U.S. Industrial Chemicals, Inc. v. Carbide &
Carbon Chemicals Corp.*, 315 U.S. 668, 676 (1942)); *see also id.* at 1362 ("the
specification must clearly and unequivocally disclose the newly claimed invention
as a separate invention").  Reissued claims are invalid where "original claims are
significantly different in scope and coverage than the [reissued] claims" and the
reissued claims do not contain a limitation found in the original claims.  *Id.*

"To be sure, the original patent requirement focuses on the original
specification rather than the original claims."  *Id.*  That is because, "by definition[,]
in reissue the original claims do not disclose the invention claimed on reissue.
Thus, [courts] must look to the specification."  *Id.*  If "[t]he original specification
[] does not adequately disclose the later-claimed [] features to meet the *Industrial
Chemicals* standard," then the reissued claims are invalid for failing the original
patent/same invention requirement.  *Id.* at 1362-63 (holding reissue claims invalid
where specification disclosed "a particular class of jet injectors" but new claims
were directed to combination of safety features without jet injector limitation).

> **b.    Analysis**

Baby Trend argues that the '919 Patent is "a broadening reissue patent of
U.S. Patent No. 6,859,957 (the ''957 Patent').["][52]  Baby Trend contends that the
original '957 Patent relates to an easily assembled baby crib using a "Clamped/Slit
connection" wherein the "fabric member is clamped between each of the upright
tubes and a corresponding one of the positioning posts, and extends outward
through the slit in each of the upright tubes."[53]  Although the '957 and '919 Patents
are very similar, Baby Trend argues that the '919 Patent is broader in "two notable
ways."[54]  First, the inventor "added to the written description of the '919 Patent to
describe an 'exposed' tube playard," and, second, he "modified original

---

[52]    *Id.* at 18:7-8.

[53]    *Id.* at 18:23-20:6.

[54]    *Id.* at 20:21-23.

independent claim 1 and added new claims 8–29, of which claims 8, 15 and 20 are independent."[55]  Each of the new claims "include[d] a new limitation reciting an 'exposed' tube look."[56]  Further, new Claims 8 and 15 omitted the Clamped/Slit Connection from the '957 Patent.[57]  Based upon those alleged changes, Baby Trend argues that Claims 1, 8, 15, and 20 (and all of their respective dependent claims) "violate the original patent requirement."[58]

Wonderland responds that Baby Trend's analysis fails to compare the new claims of the '919 Patent to the original specification of the '957 Patent.[59]  When the new claims are properly compared to the original specification, with respect to Claims 1 and 20 Wonderland argues that "the supposedly 'new' limitation about which Baby Trend complains—'the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member'—is in fact expressly disclosed in the '957 Patent."[60]  Wonderland asserts that the specification "expressly disclosed that [feature] in the preferred embodiment illustrated in Figures 4 and 5."[61]  Additionally, the original specification criticized stretching the fabric over the upright tubes and noted that the new approach would improve the outward appearance.[62]  Turning to Claims 8 and 15, Wonderland argues that, comparing the new claim language with the original specification, "the recited limitations regarding how the enclosure member interacts with the upright posts, with the positioning posts being 'lodged' inside the upright tubes, are expressly disclosed as a feature of the invention described in the '957 Patent."[63]

In reply, Baby Trend maintains that Wonderland "errantly cast[s] the § 251 framework as nothing more than the § 112 written description requirement" and ignores relevant authority.[64]

---

[55]     *Id.* at 20:24-21:1.

[56]     *Id.* at 21:1-2.

[57]     *Id.* at 21:2-13.

[58]     *Id.* at 21:22-22:7.

[59]     MSJ Opposition 10:12-18 & 11:15-16.

[60]     *Id.* at 11:17-20.

[61]     *Id.* at 11:21-25.

[62]     *Id.* at 11:25-12:1.

[63]     *Id.* at 12:14-18.

[64]     MSJ Reply 7:6-8; *see also id.* at 7:9-8:9.

To resolve this dispute, the Court examines the two purported differences raised by Baby Trend:

| '957 Patent (Original) | '919 Patent (Reissue) |
| --- | --- |
| Focused on clamp/slit connection | Not limited to clamp/slit connection |
| Not focused on exposed tubes | Focused on exposed tubes |

Specifically, the Court examines whether the relevant reissued claim limitations—such as "outer tube wall defining an outer contour shape of an upright tube" with an "outwardly facing surface" and the fabric enclosure placed between the upright tubes such that "the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosed space"—are "clearly and unequivocally disclosed" in the '957 Patent's specification, or, rather, whether the specification "merely suggest[s] or indicate[s] the [exposed tubes] invention recited in the reissue claims."[65] *Forum US*, 926 F.3d at 1351-52.

Like the '919 Patent, the '957 Patent is directed to a "baby crib" with upright tubes that each has a receiving hole for a positioning post, with the fabric enclosure "clamped between each upright tube and a corresponding positioning post, and extend[ing] outward through the slit in each upright tube."[66] The '957 Patent included the same criticism of the prior art's use of screws and offered a solution with a more "appealing appearance."[67]

That is, in the preferred embodiment, "[d]uring assembly, the fabric member **2** is directly mounted on the bed frame structure **1** by inserting the positioning posts **22** respectively into the receiving holes **111** in the upright tubes **11**

---

[65]    *Compare* '919 Patent, Claim 1 (italicized language in claim added to reissue patent).

[66]    '957 Patent at Abstract [ECF No. 307-8].

[67]    *Id.* at 1:42.

through the top open ends **113**."[68]  "Since the fabric member **2** is clamped between each of the upright tubes **11** and a corresponding one of the positioning posts **22**, the fabric member **2** can be positioned fixedly on the bed frame structure **1** without the need for screws."[69]

Further, the specification teaches that, "[a]s such, not only is the assembly operation of the baby crib of the present invention quick, the outer appearance of the baby crib is enhanced as well since there are no screws visible from the exterior of the bed frame structure **1**."[70]  Adding a cap to the top of each upright tube "further enhance[d] the outer appearance of the baby crib."[71]  The specification explained that "it is apparent that through the presence of the receiving holes **111** in the upright tubes **11**," and by connecting the fabric enclosure to the upright tubes via the positioning post sleeved into the corners of the fabric enclosure, "screws are not required to position the fabric member **2** on the bed frame structure **1**."[72]  That configuration allowed for easy assembly, no risk of tearing the fabric at the screw insertion point, and an enhanced appearance.[73]

The specification depicted the preferred embodiment through several figures:

---

[68] *Id.* at 2:42-46.

[69] *Id.* at 2:65-3:1.

[70] *Id.* at 3:1-5.

[71] *Id.* at 3:6-11.

[72] *Id.* at 3:24-31.

[73] *Id.* at 3:31-35.



FIG. 3

(1 of 2)

"FIG. 3 is an exploded perspective view of the preferred embodiment of a baby crib according to the present invention"



F I G. 4

"FIG. 4 is a fragmentary schematic view of the preferred embodiment, illustrating how a fabric member is positioned on a bed frame structure"



F I G. 3

(2 of 2)



F I G. 5

"FIG. 5 is a sectional view of the preferred embodiment taken along line V-V of FIG. 4."

Based upon a review of those figures, the Court concludes that, although the specification suggests or indicates exposed tubes as a byproduct of the clamped/slit connection, it does not clearly and unequivocally disclose the outer tube wall and its outwardly facing surface separate from the depicted clamped/slit connection. That is, the specification teaches that the clamped/slit connection allows for easy assembly and no risk of tearing from screws, resulting in a more appealing appearance (no visible screws); however, exposed tubes are not clearly and unequivocally claimed as a separate invention. Although the outer tube wall is described in the specification in connection with a new way to mount the fabric enclosure, this description depends on the clamp/slit connection for mounting, and it is not described as a separate inventive aspect of the new baby crib.

This conclusion is supported by Figures 3, 4, and 5, which do not identify exposed tubes as an independent component.[74] Although these figures may suggest exposed tubes, a mere suggestion is insufficient to meet the original patent requirement. Rather, clear and unequivocal disclosure as a separate invention is required. *Forum US*, 926 F.3d at 1351-52.

Further, a comparison of the original claims and the reissue claims shows that the '919 Patent omitted the described connection between the fabric enclosure and the upright tubes, which relates to the incidental disclosure of the exposed tubes in the specification:

---

[74] *See, e.g.*, '957 Patent at Figs. 3, 4, & 5 ("**22**" represents a plurality of positioning posts and "**11**" represents upright tubes; no mention of exposed tubes); *see also id.* at Fig. 5 ("**1152**" represents a remaining part of the upright tube wall and "**115**" represents the second wall part of the upright tube wall; no mention of exposed tubes).

| '957 Patent (Original) | '919 Patent (Reissue) | |
|---|---|---|
| Claim 1: "a plurality of positioning posts mounted on said fabric member and inserted respectively into said receiving holes in said upright tubes, said *fabric member being clamped between each of said upright tubes and a corresponding one of said positioning posts* and extending outward through said slit in each of said upright tubes." | Claim 8: "a plurality of positioning posts provided on the enclosure member at locations corresponding to the upright tubes, wherein *the positioning posts are configured to lodge into the receiving holes of the upright tubes for supporting the enclosure member between the upright tubes*, whereby the enclosure member extends from one upright tube generally in directions of other of the upright tubes" | Claim 15: "a plurality of positioning posts provided on the enclosure member at locations corresponding to the edge portions of the enclosure member, wherein *the positioning posts are lodged inside the upright tubes*, the side panels extending between the upright tubes" |

The use of "lodge" and "lodged" in the reissue claims appears to be a broader variation of "clamped," but broadening the claimed connection would disregard the examiner's explanation for allowing the claims: the prior art did not teach a clamped/slit connection and the new invention did.[75] Thus, the Court concludes that Baby Trend has demonstrated by clear and convincing evidence that the specification does not clearly and unequivocally teach exposed tubes as a separate invention. "The task is essentially one of claim construction" viewed against the specification, *Varian Semiconductor Equip. Assocs., Inc. v. Axcelis Techs., Inc.*, 2009 WL 189960, at *22 (D. Mass. Jan. 21, 2009), and when that task is completed here, the specification lacks the requisite clear and unequivocal support.

---

[75]    *See* JSUF ¶ 502 (undisputed); Joint Exhibit Part N [ECF No. 307-8] 3971, ¶ 1 (Reasons for Allowance) (the invention discloses "a fabric member *being clamped between* a plurality of positioning posts") (emphasis in original).

Thus, the '919 Patent is invalid for failing to comply with the original patent requirement and the Court **GRANTS** Baby Trend's Motion on that ground.[76]

### 3.    Absolute Intervening Rights

Baby Trend moves for summary judgment that it is "entitled to absolute intervening rights for certain accused products in existence" before the '919 Patent issued," and, thus, "those products are exempt from liability."[77]

### a.    Legal Framework

Under the intervening rights doctrine, if "the claims of [an] original and [a] reissued patent[] are substantially identical," then the reissued patent "shall constitute a continuation thereof and have effect continuously from the date of the original patent."  35 U.S.C. § 252.

If, however, prior to the grant of the reissued patent, a person imported into the United States "anything patented by the reissued patent," then that person may continue to sell "the specific thing" so imported unless doing so "infringes a valid claim of the reissued patent which was [also] in the original patent."  *Id.* "Once a determination is made that the claims are not 'identical' within the meaning of the first paragraph of section 252, the defense of intervening rights under the second paragraph of section 252 can be raised."  *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 742 (Fed. Cir. 1993).

The term "specific thing" refers to the tangible article that qualifies for absolute intervening rights.  Such "specific things made before the date of reissue, which infringe the new reissue claims, are absolutely free of the reissued patent and may be used or sold after the date of reissue without regard to the patent."  *BIC Leisure Prods. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220-21 (Fed. Cir. 1993). Thus, "[b]ecause of the activity prior to reexamination, an infringer might enjoy an intervening right to 'continue what would otherwise be[come] infringing activity' after reexamination."  *Univ. Va. Patent Found. v. General Elec. Co.*, 792 F. Supp.

---

[76]    Some of Baby Trend's arguments pertain to infringement, not to the original patent requirement.  Baby Trend did not seek construction of "lodged" or any other terms relating to how the fabric member is held by each upright tube or connected to the other upright tubes.  To the extent that Baby Trend is raising an implicit claim construction issue as it relates to infringement, the Court declines to entertain further claim construction at this late stage of the case.

[77]    Baby Trend MSJ 1:8-10.

904, 912 (W.D. Va. 2011) (quoting *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 756 F.2d 1574, 1579 (Fed. Cir. 1985)).[78]

### b.    Analysis

Baby Trend argues that nine models of Category 1 and 2 products are subject to absolute intervening rights because they were in the U.S. before January 15, 2013—the date that the '919 Patent issued as a reissue from the '957 Patent.[79] Baby Trend contends that "there is no genuine dispute of material fact that the '919 Patent claims substantively changed from the '957 Patent claims because of patent prosecution and the Nine Models existed in the U.S. before January 15, 2013," so summary judgment is appropriate.[80]  Baby Trend avers that its expert explained why the reissue amendments were substantive and that Wonderland's expert did not challenge that opinion.[81]  Based upon internal company records that its expert analyzed, Baby Tend provides an inventory chart alleging how many units were already in the U.S. as of the relevant reissue date.[82]  Baby Trend observes that Wonderland's damages expert does not contest Baby Trend's intervening rights analysis, but, rather, Wonderland "speculates that the information on which [Baby Trend's expert] relies is not true and accurate."[83]

Wonderland challenges Baby Trend's inventory reports, arguing that Baby Trend improperly "relies on an alleged snapshot of its U.S. inventory on the day before the '919 Patent issued that was generated six months ago, for purposes of this litigation."[84]  Wonderland argues that Baby Trend's data is "inherently suspect," based upon "manual 'adjustments' to its inventory counts over the years."[85]  Wonderland asserts that Baby Trend's expert performed an unreliable

---

[78]    In this context. reissue and reexamination are used interchangeably.  *See* 35 U.S.C. § 307(b) (making 35 U.S.C. § 252 covering intervening rights applicable to reexamined patents).

[79]    Baby Trend MSJ 29:5-17.

[80]    *Id.* at 29:20-23.

[81]    *Id.* at 30:12-22.

[82]    *Id.* at 31:1-25.

[83]    *Id.* at 33:20-21.

[84]    MSJ Opposition 14:12-14; *see also id.* at 16:15-16 (challenging authenticity of "the one-page Inventory Valuation report generated in September 2021 for purposes of this litigation").

[85]    *Id.* at 14:14-16.

analysis by using purchasing information derived from "reports reflecting data that he assumed had been somehow input [in]to Baby Trend's financial systems at some unknown time in the past."[86]  Wonderland's expert opines that it is "impossible to verify the accuracy" of that data due to lack of records and numerous discrepancies.[87]  Wonderland also argues there are no records concerning when the products were imported into the U.S.[88]  Moreover, because the reliability of the inventory data turns on the credibility of Baby Trend's Vice President—with whom Baby Trend's expert discussed the inventory system—Wonderland argues that this issue is improper for resolution on summary judgment.[89]

Baby Trend replies that Wonderland's expert cannot create a controverted issue of material fact because he "cites no objective evidence that contradicts any fact on which Baby Trend relies."[90]  Baby Trend also argues that Wonderland's expert "lacks the skill, experience, training, or education to testify on this issue."[91]  In any event, Baby Trend observes that Wonderland's expert relies on sales data generated from the same accounting system in calculating damages, yet that same expert finds the inventory data from that system unreliable for the purpose of evaluating intervening rights.[92]  Baby Trend also argues that import records are unnecessary because they would be cumulative of the data already provided.[93]  Finally, Baby Trend contends that Wonderland failed to question Baby Trend's Vice President on those topics during his deposition, so his sworn declaration remains unrebutted.[94]

### i.    Substantially Identical

As an initial matter, the Court observes that Wonderland does not dispute whether the claims in the reissued patent—the '919 Patent—are different (*i.e.*, not

---

[86]    *Id.* at 15:11-12.

[87]    *Id.* at 15:16-17.

[88]    *Id.* at 15:18-23.

[89]    *Id.* at 18:22-24.

[90]    MSJ Reply 10:26-27.

[91]    *Id.* at 10:27-11:1.

[92]    *Id.* at 11:11-14 & n.8.

[93]    *Id.* at 12:11-12.

[94]    *Id.* at 12:3-4 & 12:18-20.

substantially identical) than the claims in the original '957 Patent.  Accordingly, to the extent that Baby Trend can prove that it had the specific accused products in inventory on the date of reissue (*i.e.*, January 15, 2013), Baby Trend's intervening rights would preclude liability.

## ii.   Category 1 Products

Wonderland does not dispute that, by the end of 2011, Baby Trend stopped purchasing (*i.e.*, importing for sale) Category 1 products.[95]  Although Wonderland argues that Baby Trend continued ***selling*** those products after the end of 2011, the intervening rights doctrine examines the inventory on hand as of the relevant reissue date, not the date of the last sale of such a product.  Wonderland's expert acknowledged that by the end of 2011, Baby Trend no longer made, purchased, or imported Category 1 models.[96]  Wonderland offers no basis on which to dispute that assertion as adopted by its own expert.  Further, Baby Trend's general ledger confirms that the relevant inventory was kept in the U.S., as opposed to stored abroad.[97]

Because "the end of 2011" occurred before the reissue date of January 15, 2013, the relevant Category 1 products are subject to Baby Trend's intervening rights.  Whether Baby Trend sold, lost, or destroyed those units sometime after January 15, 2013, is irrelevant because Baby Trend had purchased them no later than the end of 2011.  There is also no evidence to suggest that Baby Trend stored Category 1 inventory outside of the U.S. until some later date.[98]  Thus, the Court declines Wonderland's invitation to allow any factual disputes arising from a battle of the experts over Category 2 inventory to infect its Category 1 analysis.  Those

---

[95]    *See* JSUF ¶ 316.

[96]    *See* Expert Report of Bryan Van Uden (the "Van Uden Report") [ECF No. 326-2], Joint Ex. Part A (sealed portion) at Joint Exhibit 0312-0313, pp. 14-15 (¶ 31) ("Baby Trend 'continued selling the leftover inventory of playard products having the connection mechanism shown and charted in Wonderland's Category 1, [but] did not purchase any additional inventory of Wonderland's Category 1 after 2011.'").

[97]    *See* Joint Exhibit Part J [ECF No. 326-11] at 3283-3315; *see also* Defendant's Dispositive Motion Hearing Slides (sealed) [ECF No. 407] at Slide 88 (inventory summary chart compiling data).

[98]    *See, e.g.*, Declaration of Bradley Mattarocci [ECF No. 326-12], Joint Ex. Part S (sealed portion) at Joint Exhibit 5021, ¶ 3 (noting records showing location, receive by date, etc.) & ¶ 7 (noting recording products "stored as inventory in Baby Trend's warehouses in the United States").

categories involve different products that were acquired and sold during different time periods relevant to intervening rights.

Because Wonderland's evidentiary challenges to Baby Trend's inventory business records pertain to the specific units that Baby Trend had on hand, and Wonderland does not challenge the undisputed fact concerning when Baby Trend stopped purchasing Category 1 products (*i.e.*, the end of 2011), any disputes relating to specific product records are not material. Accordingly, the Court **GRANTS** summary judgment on Baby Trend's intervening rights defense with respect to Category 1 products.

### iii. Category 2 Products

Because the Court has granted Baby Trend's motion for summary judgment of non-infringement with respect to Category 2 products, as well as invalidity for violating the original patent requirement, the Court need not reach intervening rights with respect to Category 2 products. Because the Court does not reach intervening rights concerning Category 2 products, the Court **DENIES as moot** Baby Trend's *Daubert* motion challenging Van Uden's rebuttal analysis.

## V. CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.    Wonderland's motion for partial summary judgment is **GRANTED**.

2.    Baby Trend's summary judgment motion is **GRANTED** with respect to intervening rights for Category 1 products. The motion is **GRANTED** with respect to non-infringement of Category 2 products and Categories 3-6 products. The motion is **GRANTED** with respect to invalidity under the original patent requirement.

3.    Baby Trend's *Daubert* motion challenging the rebuttal opinions of Van Uden is **DENIED as moot**.

4.      Baby Trend is **DIRECTED** to lodge, no later than February 24, 2023, a proposed Judgment consistent with this Order.

**IT IS SO ORDERED.**

Dated: February 13, 2023

John W. Holcomb
UNITED STATES DISTRICT JUDGE